**F I L E D**
United States Court of Appeals
Tenth Circuit

**DEC 15 1998**

**PATRICK FISHER**
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENH CIRCUIT

---

CORNEL COOKS,

      Plaintiff-Appellant,

v.

RON WARD, Warden, Oklahoma State
Penitentiary, McAlester, Oklahoma,

      Defendant-Appellee.

No. 97-6105

---

ORDER ON REHEARING

---

Before **BRORBY, BRISCOE** and **MURPHY**, Circuit Judges.

---

This matter is before the court on Appellant's petition for rehearing. The original panel has voted to deny rehearing. The petition therefore is denied. The original opinion has been amended, however, to clarify our holding that Mr. Cooks waived his right to counsel under both the Fifth and Sixth Amendments. The amended opinion is attached to this order; all revisions are found under the heading **"I. Admissibility of Post-Arrest Statements."** The attached opinion is substituted for the one previously filed on October 28, 1998. The amended opinion will reissue this date.

The suggestion for rehearing en banc was transmitted to all the judges of the court who are in regular active service as required by Fed. R. App. P. 35. As no member of the panel and no judge in regular active service on the court requested the court be polled, the suggestion is also denied.

**Entered for the Court**

**WADE BRORBY**
United States Circuit Judge

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 15 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CORNEL COOKS,

      Plaintiff-Appellant,

v.

RON WARD, Warden, Oklahoma State
Penitentiary, McAlester, Oklahoma,

      Defendant-Appellee.

No. 97-6105

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 87-CV-1538)**

---

Vicki Ruth Adams Werneke, Assistant Federal Public Defender, Oklahoma City,
Oklahoma, for Plaintiff-Appellant.

Sandra D. Howard (W.A. Drew Edmondson, Attorney General, with her on the
brief), Assistant Attorney General, Oklahoma City, Oklahoma, for Defendant-
Appellee.

---

Before **BRORBY, BRISCOE** and **MURPHY**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

---

Petitioner Cornel Cooks appeals the denial of his petition for a writ of habeas corpus seeking to overturn his capital murder conviction and death sentence. We affirm both the conviction and sentence.

## BACKGROUND

In March 1983, Mr. Cooks and a co-defendant, Rodney Madson Masters, a/k/a William Wallace Troxell, were tried together in Oklahoma state court on an information alleging (1) murder with malice aforethought, (2) felony murder while in the commission of first degree rape, and (3) felony murder while in the commission of first degree burglary. A jury convicted both men for the murder of Mr. Cooks' disabled, eighty-seven-year-old neighbor, Jennie Ridling. Mrs. Ridling suffocated to death after a piece of gauze-like material had been tightly wrapped around her head. The evidence indicated Mrs. Ridling was raped, and her home ransacked and burglarized.

After the sentencing stage of trial, the jury found three aggravating circumstances as to Mr. Cooks: (1) he previously was convicted of a felony involving the use or threat of violence; (2) Mrs. Ridling's murder was especially heinous, atrocious or cruel; and (3) he represented a continuing threat to society. Based on these aggravators, the jury sentenced Mr. Cooks to death. Mr. Masters

was sentenced to life imprisonment.

Mr. Cooks took a direct appeal to the Oklahoma Court of Criminal Appeals, represented by the same attorney who represented him at trial, Mr. Stephen Hilliary. That court affirmed his conviction and sentence. *Cooks v. State*, 699 P.2d 653 (Okla. Crim. App.), *cert. denied*, 474 U.S. 935 (1985). Represented by new counsel, Mr. Cooks filed an application for post-conviction relief in the District Court of Comanche County. The district court denied relief and was affirmed on appeal to the Oklahoma Court of Criminal Appeals. *Cooks v. State*, Case No. PC-86-613 (Okla. Crim. App. Jan. 13, 1987), *cert. denied*, 481 U.S. 1072 (1987).

Mr. Cooks first filed a habeas petition in the United States District Court for the Western District of Oklahoma in July 1987, whereupon the district court held the petition in abeyance and ordered Mr. Cooks to exhaust his state remedies on the issue of whether his jury was instructed properly on the heinous, atrocious, or cruel aggravating circumstance in light of *Maynard v. Cartwright*, 486 U.S. 356 (1988). The Oklahoma trial court denied Mr. Cooks' second application for post-conviction relief. That decision was affirmed in *Cooks v. State*, Case No. PC-89-131 (Okla. Crim. App. Jan. 11, 1993), *cert. denied*, 510 U.S. 851 (1993).

The district court ordered the federal case reopened in February 1994. Mr. Cooks filed an amended habeas petition in May 1994. The court conducted an evidentiary hearing on the ineffective assistance of counsel issue in August 1995 and allowed the parties to brief the issues raised in the amended petition. In February 1997, the district court denied Mr. Cooks' petition. Pursuant to the then recently enacted provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the district court granted Mr. Cooks a certificate of appealability on certain issues.

Subsequent to the district court's ruling, *Lindh v. Murphy,* 521 U.S. 320, ___, 117 S. Ct. 2059, 2068 (1997), held that § 2253(c) of the AEDPA (pertaining to the certificate of appealability) applies only to cases filed after April 24, 1996. Because Mr. Cooks' amended petition was filed before that date, the certificate of appealability is not a jurisdictional requirement in this case; rather, the district court or this court must issue a certificate of probable cause. Because we conclude Mr. Cooks has made a "substantial showing of the denial of [a] federal right," *Barefoot v. Estelle,* 463 U.S. 880, 893 (1983) (internal quotation marks and citation omitted), we grant a certificate of probable cause and proceed to consider all Mr. Cooks' issues, applying pre-AEDPA law.

**DISCUSSION**

Mr. Cooks raises four primary issues on appeal from the denial of his habeas petition: (1) his post-arrest statements were involuntary and therefore inadmissible; (2) the "continuing threat" and "heinous, atrocious, or cruel" aggravating circumstances are unconstitutional and unsupported by sufficient evidence; (3) certain jury instructions concerning mitigating circumstances confused the jury and thus rendered his death sentence unconstitutional; and (4) he received ineffective assistance of counsel during both the guilt and sentencing stages of trial, as well as on direct appeal.

We review the district court's legal conclusions concerning these issues de novo and its factual findings for clear error. *Hill v. Reynolds*, 942 F.2d 1494, 1495 (10th Cir. 1991). Habeas relief must be granted only if the claimed constitutional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Kyles v. Whitley*, 514 U.S. 419, 435-36 (1995) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). If we are in "grave doubt" about whether an error satisfies that standard, then the error cannot be treated as harmless and the petitioner must prevail. *O'Neal v. McAninch*, 513 U.S. 432, 437-38 (1995).

## I. *Admissibility of Post-Arrest Statements*

Mr. Cooks was arrested in the early morning of October 29, 1982. Police advised him of his *Miranda*[1] rights upon arrest. Detectives attempted to question Mr. Cooks later that same day; Mr. Cooks refused to answer questions, however, and requested a lawyer. The following evening, October 30, a jailer informed Detective Belcher that Mr. Cooks wanted to speak to him. Detective Belcher again advised Mr. Cooks of his *Miranda* rights. Mr. Cooks signed a form acknowledging those rights and stating he had voluntarily summoned the detective and wished to provide information concerning Ms. Ridling's murder. Mr. Cooks then proceeded to make self-incriminating statements. Two days later, November 1, Mr. Cooks made additional statements after detectives questioned him regarding differences between his and Mr. Masters' initial statements. Again, Mr. Cooks affirmatively stated he understood his rights prior to providing additional information without legal representation.[2]

In his habeas petition and brief on appeal to this court, Mr. Cooks claims his post-arrest statements were involuntary and acquired in violation of his

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] We note Mr. Cooks did not receive his court-appointed lawyer, Mr. Hilliary, until November 12, 1982.

constitutional right to counsel. He argues, without elaboration, his mental impairment and intellectual limits prevented him from comprehending the "abstract concepts thrown at him by the detectives." He further asserts "the detectives initiated an interrogation, promised him leniency, and threatened him with 'the needle' when he refused to talk."

The district court concluded Mr. Cooks' post-arrest statements were voluntary, and found, "[b]ased upon a review of the particular facts and circumstances of this case, including [Mr.] Cooks' background and experience," Mr. Cooks "knowingly waived his right to remain silent." We review the district court's findings of fact for clear error. *See United States v. Bautista*, 145 F.3d 1140, 1146 (10th Cir.), *cert. denied*, 1998 WL 480103 (U.S. Oct. 5, 1998) (No. 98-5584). However, the ultimate issue of voluntariness is subject to *de novo* review, considering the entire record and the totality of the circumstances. *Id.* at 1149.

Mr. Cooks' Fifth Amendment right to counsel attached the moment he requested an attorney. *United States v. Johnson*, 42 F.3d 1312, 1318 (10th Cir. 1994) (citing *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966)), *cert. denied*, 514 U.S. 1055 (1995). However, if Mr. Cooks subsequently voluntarily initiated

further communication with law enforcement officials, the law recognizes he effectively waived his previously invoked right to counsel. *Edwards v. Arizona*, 451 U.S. 477, 484-86 (1981); *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983). This same rule applies in the Sixth Amendment context to evaluate a waiver of right to counsel after arraignment. *Michigan v. Jackson*, 475 U.S. 625, 635-36 (1986). A waiver is voluntary if the record demonstrates it "(1) ... was a product of a free and deliberate choice rather than intimidation, coercion, or deception, and (2) ... was made in full awareness of the nature of the right being waived and the consequences of waiving." *Bautista*, 145 F.3d at 1149.

By any account, the police *Mirandized* Mr. Cooks upon his arrest. Police officers testified they repeated Mr. Cooks' *Miranda* rights later that same day, prior to attempting to interrogate him at the police station. The officers recalled that Mr. Cooks refused at that time to make a statement and requested a lawyer. Detective Belcher ceased the interrogation at that point. This exercise of rights indicates Mr. Cooks understood from the beginning both the nature and consequences of his right to remain silent and his right to counsel.

It is also undisputed that approximately twenty-four hours after police first attempted to question Mr. Cooks, after Detective Mahamed allegedly suggested

Mr. Cooks would "get the needle" if he did not cooperate, and after he had been formally arraigned, *Mr. Cooks told* a jailor he wished to speak to Detective Belcher. Nothing in the record suggests police further pressured Mr. Cooks into giving a statement without a lawyer present, or that Mr. Cooks was intimidated by Detective Mahamed's alleged statements. Indeed, a full day had passed with no further attempt to speak to Mr. Cooks. When Detective Belcher came to the jail *at Mr. Cooks' request*, he carefully advised Mr. Cooks of his rights prior to any conversation. Mr. Cooks signed an Advice of Rights form indicating he had an eleventh grade education and affirming (1) he understood each component of his *Miranda* rights, (2) no pressure or coercion had been used against him, and (3) he nevertheless desired to make a statement and answer questions without an attorney present. Mr. Cooks does not claim Detective Belcher or anyone else made any promises, threats, or any further comments regarding "the needle" at this time. After Detective Belcher typed Mr. Cooks' responses to his questions, Mr. Cooks signed the two-page statement, attesting it was a "true and accurate account" of events and was given to the police "freely and voluntarily, without fear of threat or promise of reward." Mr. Cooks signed another Advice of Rights form and typed statement after he spoke to Detectives Belcher and Mahamed on November 1. Detective Belcher testified that on both occasions Mr. Cooks appeared to understand his rights and did not appear to be under the influence of

intoxicants.

Having independently reviewed the entire record and totality of the circumstances, we find no clear error in the district court's finding Mr. Cooks initiated his post-arrest, post-arraignment conversation with Detective Belcher, and there was no deception, intimidation or coercion sufficient to taint Mr. Cooks' waiver of rights under the Fifth, Sixth, and Fourteenth Amendments. Accordingly, we hold Mr. Cooks' waiver of counsel and post-arrest statements were voluntary, knowing and intelligent, and therefore deny habeas relief on this ground.

## II. *Constitutionality of Aggravating Circumstances*

"The constitutional validity of aggravating [circumstances] is a question of law subject to *de novo* review." *United States v. McCullah*, 76 F.3d 1087, 1107 (10th Cir. 1996), *cert. denied*, 117 S. Ct. 1699 (1997).

### A. <u>Continuing Threat to Society</u>

Mr. Cooks claims the "continuing threat to society" aggravator is unconstitutionally applied in Oklahoma because it "functions as a catch-all circumstance that fails completely to narrow the class of individuals eligible for

death." He further claims the "continuing threat" aggravator unconstitutionally overlaps the "prior conviction" aggravator in this case.

This court already has upheld the constitutionality of Oklahoma's "continuing threat to society" aggravator inasmuch as Mr. Cooks claims it is vague and fails to narrow the class of individuals eligible for death. *Nguyen v. Reynolds*, 131 F.3d 1340, 1352-54 (10th Cir. 1997), *cert. denied*, 119 S. Ct. 128 (1998). That resolution binds this panel. *United States v. Foster*, 104 F.3d 1228, 1229 (10th Cir. 1997).

Mr. Cooks' argument the "continuing threat" aggravator impermissibly overlaps the "prior conviction" aggravator is likewise unavailing. It is true we have held certain aggravating circumstances may impermissibly overlap and therefore unconstitutionally skew the process of weighing aggravating and mitigating circumstances. *See McCullah*, 76 F.3d at 1111-12. Such precedent does not, however, stand for the proposition that any time evidence supports more than one aggravating circumstance, those circumstances impermissibly overlap, *per se*. The test we apply is not whether certain evidence is relevant to both aggravators, but rather, whether one aggravating circumstance "necessarily subsumes" the other. *Id.* at 1111. Under the facts and circumstances of this case,

-11-

there are two reasons the "continuing threat" aggravator did not subsume the "prior conviction" aggravator.

First, although Mr. Cooks' jury may have considered evidence of his prior conviction of a violent crime in the context of determining the presence of both the "prior conviction" and "continuing threat" aggravators, the "prior conviction" circumstance focused the jury's attention on the particular nature and consequences of his *past* conduct, while the "continuing threat" aggravator focused attention on the likelihood of *future* violent conduct. Second, under Oklahoma law, evidence regarding the callous nature of a crime, alone, is sufficient to support a jury's finding a defendant poses a continuing threat to society. *See Coleman v. Saffle*, 869 F.2d 1377, 1390 (10th Cir. 1989), *cert. denied*, 494 U.S. 1090 (1990); *Pennington v. State*, 913 P.2d 1356, 1371 (Okla. Crim. App. 1995), *cert. denied*, 117 S. Ct. 121 (1996). The record here is replete with evidence that supports a finding Ms. Ridling's murder was, indeed, callous. Ms. Ridling was both elderly and disabled. Nevertheless, Mr. Cooks and Mr. Masters broke into her home, held her down, and then gagged her with sufficient force to lay her nose over to one side. The record further indicates that after binding and gagging Ms. Ridling, Mr. Cooks raped her and then proceeded to ransack her home and steal her possessions. Mr. Cooks and Mr. Masters then left

Ms. Ridling, immobilized on her bed, to die from asphyxiation. This evidence invalidates any argument the jury's finding that Mr. Cooks posed a continuing threat to society was dependent on evidence he had committed a prior violent crime. Because the "continuing threat" aggravator did not subsume the "prior conviction" aggravator in this case, we find no constitutional error that warrants habeas relief.

### B.  **Heinous, Atrocious or Cruel**

Mr. Cooks argues "Oklahoma has no genuinely meaningful or principled narrowing construction for its 'especially heinous, atrocious or cruel' aggravating circumstance," as required by the Eighth and Fourteenth Amendments and recognized by this court in *Cartwright v. Maynard*, 822 F.2d 1477 (10th Cir. 1987), *aff'd* 486 U.S. 356 (1988). More specifically, he claims the second paragraph of Jury Instruction No. 51 failed to sufficiently narrow the circumstances within which this aggravator could be applied.[3] Even if we deem

---

[3]  Jury Instruction No. 51 read:

> As used in these instructions, the term "heninous" [sic] means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

> The phrase "especially heinous, atrocious, or cruel" is directed

the instruction sufficient, Mr. Cooks asserts "the State failed to prove the 'heinous, atrocious, or cruel' aggravating circumstance beyond a reasonable doubt."

We considered and rejected this same constitutional argument concerning the same jury instruction in *Duvall v. Reynolds*, 139 F.3d 768, 792-93 (10th Cir. 1998), *cert. denied*, 119 S. Ct. 345 (1998). Oklahoma's narrowed interpretation of the "especially heinous, atrocious, or cruel" aggravator as articulated in the second paragraph of the standard jury instruction was held to satisfy the *Cartwright* standard in *Hatch v. Oklahoma*, 58 F.3d 1447, 1468-69 (10th Cir. 1995), *cert. denied*, 517 U.S. 1235 (1996). The *Duvall* decision extended *Hatch* by opining that the Oklahoma courts consistently have "interpreted the 'especially heinous, atrocious, or cruel' aggravator to require 'torture' and 'serious physical abuse' as evidenced by proof of conscious physical suffering." *Duvall*, 139 F.3d at 793. Equally important, *Duvall* held Oklahoma courts consistently have applied that standard when evaluating whether the evidence justifies a finding of the "heinous, atrocious or cruel" aggravator. *Id*. *Duvall* therefore is dispositive on this issue. *Foster*, 104 F.3d at 1229.

---

to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse.

-14-

Furthermore, we conclude the record supports the jury's finding that Ms. Ridling experienced conscious physical suffering sufficient to establish torture or serious physical abuse as interpreted by the Oklahoma courts. The record reveals Ms. Ridling suffered injury to the urethral opening, as well as a "significant blow to the head," bruises on both sides of her face, over the knuckles, and on the top of her left foot. Dr. Robert Dix, the state's medical examiner, testified the bruised knuckles and foot indicated she had hit and kicked her attacker. The autopsy report likewise cited the fresh bruises as "evidence of a struggle." With regard to his findings concerning "asphyxiation due to gag" as the specific cause of death, Dr. Dix testified there was evidence of a gag that left Ms. Ridling's face "quite distorted." The upper part of her face was "very swollen" and, while the indentations in the swollen tissue were not necessarily caused by force, the gag was tied with sufficient pressure to lay Ms. Ridling's nose "over to one side." It was Dr. Dix's opinion Ms. Ridling "was alive for some time in order for that swelling to take place in the face." On cross-examination, Dr. Dix estimated it took "more than an hour or two" for her death to occur. This evidence amply supports application of the "heinous, atrocious or cruel" aggravator. Because we hold that aggravator is not unconstitutional on its face or as applied in this case, we deny Mr. Cooks' request for habeas relief on this ground.

-15-

### III. *Jury Instructions Concerning Mitigating Circumstances*

#### A. <u>Jury Instruction No. 55 - Jury Discretion to Impose a Life Sentence</u>

Mr. Cooks asserts the trial court erroneously failed to inform the jury it had the option to return a life sentence even if it found the aggravating circumstances to outweigh the mitigating circumstances. He claims Jury Instruction No. 55 "misled the jury by implying it was required to find the existence of specific mitigating circumstances before it could sentence [him] to life imprisonment." Jury Instruction No. 55 advised the jury:

> If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, unless you also unanimously find that any such aggravating circumstance or circumstances out weigh [sic] the finding of one or more mitigating circumstances, the death penalty shall not be imposed.

It is important to note Jury Instruction No. 55 was not the only instruction concerning aggravating and mitigating circumstances. The court also instructed the jury, in pertinent part:

Instruction No. 52

> ...
>
> Should you unanimously find that one or more aggravating circumstances existed beyond a reasonable doubt, you would be authorized to consider imposing a sentence of death.

-16-

If you do not unanimously find beyond a reasonable doubt that one or more of the aggravating circumstances existed, you are prohibited from considering the penalty of death. In that event, the sentence must be imprisonment for life.

Instruction No. 53

Mitigating circumstances are those which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame. The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstances of this case.

We considered, but rejected, the same argument Mr. Cooks makes here, concerning a substantially similar set of jury instructions, in *Duvall*, 139 F.3d at 789-92. We reach the same result here. Mr. Cooks is correct that under Oklahoma law a jury may avoid the death penalty even if it finds aggravating circumstances to outweigh mitigating circumstances. *Duvall*, 139 F.3d at 789-90. However, state courts are not constitutionally bound to "'affirmatively structure in a particular way the manner in which juries consider mitigating evidence.'" *Id.* at 790 (quoting *Buchanan v. Angelone,* ___ U.S. ___, 118 S. Ct. 757, 761 (1998)). Thus, so long as the court does not preclude the jury from giving effect to any relevant mitigating evidence, it need not separately instruct the jury of its option to return a life sentence regardless of its finding the aggravating circumstances outweigh the mitigating circumstances. *Id.* at 790-91. On review, we need only ensure there is no reasonable likelihood the jury applied the

-17-

challenged instruction in a way that prevented the consideration of relevant evidence. *Id*. at 790; *see also Castro v. Ward*, 138 F.3d 810, 824 (10th Cir.), *cert. denied*, 119 S. Ct. 422 (1998).

In this case, the instructions, read as a whole, did not preclude the jurors from considering and giving effect to any mitigating circumstances in Mr. Cooks' favor. Nor did they suggest the jury's discretion to avoid the death penalty was limited in any way. Instruction No. 53 expressly permitted the jury to consider any evidence as mitigating evidence. We see no likelihood the jury would have understood they were required to find a particular mitigating circumstance. Instructions Nos. 54 and 55 merely authorized the jury to consider the death penalty if, and only if, it unanimously found one or more aggravating circumstances to outweigh any mitigating circumstances. These instructions cannot fairly be read to have mandated imposition of the death penalty. Accordingly, Mr. Cooks is not entitled to habeas relief on this ground.

**B. Jury Instruction No. 54 - Minimum Mitigating Circumstances**

Jury Instruction No. 54 advised the jury:

Evidence has been offered as to the following minimum mitigating circumstances:

1.     The defendant has no significant history of prior criminal

-18-

activity;

2. The age of the defendant at the time of the crime.

Whether these circumstances existed, and whether these circumstances are mitigating, must be decided by you.

Mr. Cooks argues this jury instruction misled the jury into believing these were the only mitigating circumstances that could support a life sentence. Further, because Mr. Cooks claims these circumstances applied only to his co-defendant, he argues the jury effectively was instructed there was no mitigating evidence to support him. According to Mr. Cooks, the prejudice he suffered as a result of Jury Instruction No. 54 was exacerbated by his co-defendant's counsel's closing statements that Jury Instruction No. 54 "stated the law" and that his client was "a young, inexperienced gentleman, led into crime by an older, convicted criminal."

As stated above, we review jury instructions pertaining to mitigating evidence only to ensure there is no reasonable likelihood the jury applied the challenged instruction in a way that prevented the consideration of relevant evidence. *Duvall*, 139 F.3d at 790. While we appreciate Mr. Cooks' concern Jury Instruction No. 54 specified mitigating evidence that arguably did not apply to

him,[4] and referred to "the defendant" in the singular when in fact the case was being tried against two defendants, we do not believe the instructions, read as a whole, prevented the jury from considering any and all mitigating evidence that might support either defendant.

Despite Jury Instruction No. 54's infirmities, the fact remains Instruction No. 53 broadly defined mitigating circumstances as any circumstances that, "in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame," and then left the determination of what constituted mitigating circumstances in this case to the jury's sound discretion. We fail to see how the specificity of Jury Instruction No. 54 in any way undermined the general directives of Instruction No. 53. Moreover, we see nothing patently erroneous or inappropriate in the closing comments of Mr. Masters' counsel – certainly nothing that rises to the constitutional level necessary to support Mr. Cooks' habeas petition. Consequently, relief is denied on this ground.

Mr. Cooks' concerns with Jury Instruction No. 54 appear to stem not so

---

[4] The instruction referred to evidence to the effect "[t]he defendant has no significant history of prior criminal activity"; however, the jury had received evidence regarding Mr. Cooks' prior criminal activity.

much from the instructions themselves or the remarks of his co-defendant's counsel, but from his own attorney's failure to present mitigating evidence on his behalf, or to offer any alternative or supplemental instructions. We thus proceed to consider Mr. Cooks' ineffective assistance of counsel claims.

## IV. *Ineffective Assistance of Counsel*

Mr. Cooks claims he received ineffective assistance of counsel at both the guilt and sentencing stages of trial, as well as on direct appeal. An ineffective counsel claim presents a mixed question of fact and law we review *de novo*. *Williamson v. Ward*, 110 F.3d 1508, 1513 (10th Cir. 1997).

To prevail on this claim, Mr. Cooks must first demonstrate his counsel "committed serious errors in light of 'prevailing professional norms'" such that his legal representation fell below an objective standard of reasonableness.[5]

---

[5] Mr. Cooks bases his ineffective assistance claim in large part on his counsel's relative inexperience and the failure of the Oklahoma court system to appoint more qualified and experienced attorneys in capital cases. He asserts these are crucial factors to consider when determining ineffectiveness of counsel. Such reliance on inexperience and the imperfections of the court appointment system is misplaced. When considering an ineffective assistance of counsel claim, this court must focus on the attorney's performance, not his experience. An attorney with little or no prior experience certainly can render effective assistance. Mr. Cooks therefore must demonstrate specific instances of deficient conduct, not simply allege inexperience. *See United States v. Cronic*, 466 U.S. 648, 665 (1984); *LaGrand v. Stewart*, 133 F.3d 1253, 1275 (9th Cir.), *cert.*

*United States v. Haddock*, 12 F.3d 950, 955 (10th Cir. 1993) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). If Mr. Cooks demonstrates constitutionally deficient performance, he must then show prejudice – "a 'reasonable probability' that the outcome would have been different had those errors not occurred." *Id.* at 955 (quoting *Strickland*, 466 U.S. at 694). This court may address the performance and prejudice components in any order, but need not address both if Mr. Cooks fails to make a sufficient showing of one. *Strickland*, 466 U.S. at 697.

## A. Trial Stage

According to Mr. Cooks, Mr. Hilliary failed to adequately investigate and prepare for the guilt/innocence stage of trial, particularly with regard to presentation of an intoxication defense. He asserts Mr. Hilliary's defense strategy "to hold the State to their burden of proof on each and every element of the crime beyond a reasonable doubt, hoping ... that during the course of the trial there would be some substantial errors ... and that the State would just not be able to meet their burden of proof in the case," amounted to no coherent defense strategy at all. In support of this claim, Mr. Cooks relies in part on the testimony of Mr.

---

*denied*, 119 S. Ct. 422 (1998).

David Autry, an attorney with experience litigating capital offenses, who testified as an "expert" during the 1995 evidentiary hearing in federal district court concerning Mr. Cooks' ineffective assistance of counsel claims. Mr. Autry opined that Mr. Hilliary was ineffective during the guilt stage of trial, and that Mr. Cooks was substantially prejudiced by his counsel's errors and omissions.

Under the circumstances, we need express no opinion whether Mr. Hilliary's performance fell below the prevailing professional standard. Since Mr. Cooks fails to prove he was in any way prejudiced by Mr. Hilliary's performance, we proceed directly to our analysis of that issue. *See Castro*, 138 F.3d at 832.

In evaluating prejudice during the guilt/innocence stage of trial, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. To answer this question we must look at the totality of the evidence, not just evidence that would have been helpful to Mr. Cooks' case. *See Brewer v. Reynolds*, 51 F.3d 1519, 1527 (10th Cir. 1995), *cert. denied*, 516 U.S. 1123 (1996); *see also Robison v. Maynard*, 829 F.2d 1501, 1510 (10th Cir. 1987).

Perhaps as Mr. Cooks suggests, Mr. Hilliary could have gathered and

presented further evidence of Mr. Cooks' state of intoxication immediately prior to the crime. The record demonstrates, however, the jury was generally aware Mr. Cooks had been drinking for some time prior to entering Mrs. Ridling's home. In addition, during closing arguments, Mr. Hilliary told the jury Mr. Cooks' judgment had been impaired by his drinking. Mr. Cooks offers no cogent argument the law provided an intoxication defense to the felony murder charges, or that if an intoxication defense was available, he was intoxicated to the extent he was incapable of forming the necessary criminal intent. Under these circumstances, we fail to see how additional, more specific evidence of intoxication would have had any bearing on the jury's determination of Mr. Cooks' guilt.

Even more important to our analysis here is the fact the record is replete with evidence of Mr. Cooks' guilt, not the least of which is Mr. Cooks' own statements admitting he bound, gagged, raped, and robbed Mrs. Ridling. Mr. Cooks' admissions were corroborated by the post-arrest statements and trial testimony of his co-defendant, Mr. Masters. For these reasons, we conclude there is no reasonable probability Mr. Cooks would have avoided the murder conviction had his counsel performed differently. Accordingly, Mr. Cooks was not prejudiced by Mr. Hilliary's performance during the guilt stage of trial, and he is

not entitled to habeas relief on this ground.

## B. **Sentencing Stage**

Here again, the essence of Mr. Cooks' claim is Mr. Hilliary's alleged failure to adequately investigate and prepare. With regard to the sentencing stage, Mr. Cooks focuses primarily on mitigating evidence he claims was available at trial, but which Mr. Hilliary, for no apparent strategical reason, failed to develop and present to the jury as a reasonable explanation for Mr. Cooks' criminal conduct. Mr. Cooks identifies the following mitigating evidence in support of his claim:

1.    Mr. Cooks was a person of limited intellectual capacity;

2.    he had endured an unhappy and deprived childhood;

3.    he had a severe drinking problem, which began at an early age;

4.    he had severe psychological and mental problems at the time of the offense;

5.    his mental problems were compounded at the time of the offense by excessive drinking and use of the drug commonly called PCP, which altered his ordinarily peaceful, nonviolent disposition;

6.    he was a good worker during intermittent periods of sobriety;

7.    during periods when he was drug free and sober, he was a responsible, caring and nonviolent person;

8.    he repeatedly expressed remorse and shame in

connection with the incident that resulted in the death of Ms. Ridling;

9.      he had enlisted in the Navy at the age of eighteen, but was honorably discharged after four months and twenty days because of ineptitude.

Mr. Cooks argues such evidence would have presented "[a] powerful case in mitigation ... that ... could have resulted in a life sentence, just as Mr. Masters, the codefendant, received."

The obligation to provide effective assistance of counsel unquestionably extends to a capital sentencing hearing. *Davis v. Executive Director of Dep't of Corrections*, 100 F.3d 750, 756 (10th Cir. 1996), *cert. denied*, 117 S. Ct. 1703 (1997); *Brecheen v. Reynolds*, 41 F.3d 1343, 1365 (10th Cir. 1994), *cert. denied*, 515 U.S. 1135 (1995). Indeed, we have recognized a need to apply even closer scrutiny when reviewing attorney performance during the sentencing phase of a capital case. "'[T]he minimized state interest in finality when resentencing alone is the remedy, combined with the acute interest of a defendant facing death, justify a court's closer scrutiny of attorney performance at the sentencing phase.'" *Moore v. Reynolds*, 153 F.3d 1086, 1116 n.1 (10th Cir. 1998) (Brorby, J dissenting) (quoting *Osborn v. Shillinger*, 861 F.2d 612, 626 n.12 (10th Cir. 1988)). Having carefully reviewed the trial and 1995 evidentiary hearing transcripts with these principles in mind, we agree with Mr. Cooks his attorney

-26-

was ineffective at the sentencing stage.

Mr. Hilliary waived his opportunity to make an opening statement at the outset of the sentencing hearing, called no witnesses, and presented no evidence on Mr. Cooks' behalf. Although he briefly cross-examined the prosecution's two witnesses, Mr. Hilliary did not cross-examine Mr. Cooks' co-defendant, Mr. Masters, who told the jury he did not strike Mrs. Ridling, tie her up or participate in raping her. Mr. Masters nevertheless expressed remorse over Mrs. Ridling's death and testified he had no prior felony convictions, had trouble in school and an unstable home life, and had consumed a case of beer and about four pints of rum prior to breaking into Mrs. Ridling's home. Mr. Masters characterized himself as a follower rather than a leader. At the end of his testimony, Mr. Masters told the jury he thought some useful purpose could be served if he was given life imprisonment and asked the jury to spare him from the death penalty. Aside from the limited cross-examination of the State's witnesses, Mr. Cooks' sentencing stage defense consisted solely of Mr. Long's[6] brief (three transcript pages) and generic closing argument reminding the jury of the seriousness and finality of their sentencing decision and asking them to impose a sentence of life

---

[6] Mr. Long was an older, more experienced attorney, who volunteered to help his friend, Mr. Hilliary, defend Mr. Cooks.

imprisonment.

When invited to explain his sentencing stage strategy during the 1995 evidentiary hearing, Mr. Hilliary stated he understood the importance of the sentencing stage and "attempted to develop a second stage strategy." Mr. Hilliary further testified he and Mr. Long attempted to "gather and glean evidence that would have been helpful to Mr. Cooks in the second stage of the trial." Notably, however, Mr. Hilliary never articulated a strategy and later admitted "there was not much second[] stage defense put on."

Indeed, we are unable to glean from the record any second stage strategy developed to defend Mr. Cooks against the death penalty. What is more, by all accounts, Mr. Hilliary's investigative efforts were minimal. Mr. Hilliary spoke to Mr. Cooks' wife on several occasions before and during trial, and to Mr. Cooks' mother and two of his brothers during trial recesses. However, by Mr. Hilliary's own admission, he did not speak to Mr. Cooks' stepfather; did not investigate Mr. Cooks' school records or speak to Mr. Cooks' teachers; did not investigate Mr. Cooks' military records; and, because he was aware the Department of Corrections questioned the credibility of the state hospital's mental evaluations, did not review any records concerning Mr. Cooks' mental evaluation or introduce

as evidence a letter from the state hospital stating Mr. Cooks was not considered dangerous to himself or society. Mr. Hilliary further admitted he was not aware of Mr. Cooks' abusive childhood environment prior to trial. Mr. Hilliary testified he and Mr. Long discussed the possibility Mr. Cooks' documented good behavior during a prior incarceration could be used as mitigating evidence, but he left the decision whether to present such evidence to Mr. Long. On cross-examination, Mr. Hilliary admitted he should have used that evidence during the sentencing stage. Perhaps most troubling is the fact Mr. Hilliary stated he knew Mr. Cooks was remorseful, but offered no reason, strategic or otherwise, to explain why he did not consider putting Mr. Cooks on the witness stand during the sentencing stage.

This is not a case in which the defendant refused to testify or otherwise influenced the reasonableness of counsel's actions. *See Brecheen*, 41 F.3d at 1369-70. Nor could counsel argue the available mitigating evidence conflicted with the trial defense. *See Stafford v. Saffle*, 34 F.3d 1557, 1563 (10th Cir. 1994), *cert. denied*, 514 U.S. 1099 (1995). This also is not a case in which counsel reasonably investigated the defendant's background, but found no one willing to testify, *see, e.g., Nguyen*, 131 F.3d at 1348-49, or determined the mitigating

evidence Mr. Cooks now relies on could do more harm than good.[7] *See Burger v. Kemp*, 483 U.S. 776, 790-91 (1987); *Brecheen*, 41 F.3d at 1367. Rather, this is a case in which counsel admitted his investigation was limited, admitted he should have presented certain mitigating evidence and, most important, offered no strategy, reasonable or otherwise, to explain his performance during the sentencing stage. Even applying the presumption of adequate performance, we cannot help but conclude counsel failed under these circumstances to satisfy his "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Accordingly, we hold Mr. Cooks was denied effective assistance of counsel during the sentencing stage of his trial.

We must now determine whether Mr. Hilliary's substandard performance prejudiced Mr. Cooks at the sentencing stage. Mr. Cooks seems to argue the circumstances of his case warrant application of the presumption of prejudice acknowledged in *United States v. Cronic*, 466 U.S. 648, 658-60 (1984). According to Mr. Cooks, his counsel's inaction during the sentencing stage

---

[7] Mr. Hilliary did determine the testimony of Mr. Cooks' mother and brothers could have done more harm than good; however, there were numerous other sources of mitigating evidence Mr. Hilliary did not similarly evaluate.

transformed that phase of trial "into a proceeding dominated exclusively by the State," and thus failed "to subject the prosecution's case to meaningful adversarial testing." If the adversary process during the penalty phase failed, Mr. Cooks argues his death sentence was rendered presumptively unreliable.

The Supreme Court in *Cronic* recognized that in rare instances it may be appropriate to presume prejudice "without inquiry into counsel's actual performance at trial," because the circumstances "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658, 662. Circumstances that justify a presumption of prejudice include the absence of counsel at a critical stage of trial, the denial of the right to effective cross-examination, and the complete failure to subject the prosecution's case to adversarial testing; but, as the Supreme Court points out, a presumption of prejudice is the exception, not the rule. *Id*. at 659.

Although we agree Mr. Hilliary was ineffective during the sentencing stage, his failures do not amount to the kind of actual or constructive denial of counsel necessary to trigger a presumption of prejudice. Mr. Hilliary was present in the courtroom. He conducted limited cross-examination, made evidentiary objections, and gave a closing argument. Hence, this case falls outside the narrow *Cronic*

exception.

Since *Cronic* does not apply, Mr. Cooks must affirmatively prove actual prejudice by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 693-94. As applied to the sentencing stage of his trial, Mr. Cooks must demonstrate "a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id*. at 695. Mr. Cooks has not met this standard.

"In evaluating prejudice, we must keep in mind the strength of the government's case and the aggravating [circumstances] the jury found as well as the mitigating factors that might have been presented." *Castro*, 138 F.3d at 832 (internal quotations omitted). Here the jury found three aggravating circumstances to support Mr. Cooks' death sentence: (1) his previous conviction of a felony involving the use or threat of violence; (2) the heinous, atrocious or cruel nature of Mrs. Ridling's murder; and (3) the continuing threat Mr. Cooks presented to society. As discussed above, the government presented abundant evidence to support each of these circumstances. The mitigating evidence Mr.

Hilliary could have presented to counterbalance these aggravating circumstances centered on Mr. Cooks' troubled childhood, borderline I.Q., and history of alcohol and drug abuse. The jury also would have learned Mr. Cooks was nonviolent when sober, but was intoxicated on the night of the crime, and he was remorseful over Mrs. Ridling's death.

While we are troubled by Mr. Hilliary's failure to discover and/or present available mitigating evidence without good reason, the benchmark for evaluating Mr. Cooks' ineffectiveness claim during the sentencing stage remains "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. Applying this standard, we conclude there is no reasonable probability the available mitigating evidence would have led the jury to a different result. Mr. Cooks' background, together with the nature and circumstances of Mrs. Ridling's death, presented a strong case in support of the three determinative aggravating circumstances. Mr. Cooks was a convicted felon who, by his own admission, broke into the home of a handicapped, elderly woman, bound and gagged her, raped her, robbed her, and left her lying on her bed, partially clothed, to slowly suffocate. The available mitigating evidence simply did not outweigh these aggravating circumstances. Consequently,

counsel's substandard performance did not so undermine the proper functioning of the adversarial process that the sentencing proceeding cannot be relied on as having produced a just result. Mr. Cooks' request for habeas relief on this ground fails.

## C. __Direct Appeal__

Mr. Cooks asserts his counsel failed on direct appeal to raise "several critical issues" that would have required reversal of his conviction, or, at a minimum, vacation of the death sentence. Notably, however, Mr. Cooks identifies only two issues he suggests are "dead-bang winners" – issues which, if not raised on direct appeal, demonstrate ineffective representation, *see Banks v. Reynolds*, 54 F.3d 1508, 1515 n.13 (10th Cir. 1995): (1) the unconstitutionality of aggravating circumstances, and (2) the inadmissibility of his post-arrest statements. Because we have denied habeas relief on the merits of both these issues, Mr. Cooks' counsel cannot be said to have been ineffective for failing to raise them on direct appeal, and Mr. Cooks' conviction cannot be reversed on this ground.

## CONCLUSION

We are forever mindful that "'[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'" *Brecheen*, 41 F.3d at 1370 (quoting *Burger*, 483 U.S. at 785)). We thus have given careful consideration to each of Mr. Cooks' claims. Finding no constitutional error for the reasons stated, we **AFFIRM** Mr. Cooks' conviction and sentence.